(No. 25818.

MAURICE DARNER, Admr., *et al.* Appellants, *vs.* NATE COLBY *et al.*—(THE JOHNSON OIL REFINING COMPANY, Appellee.)

*Opinion filed February 14, 1941.*

ALSCHULER, PUTNAM, JOHNSON & RUDDY, and SEARS, O'BRIEN & STREIT, (EDWARD F. STREIT, of counsel,) for appellants.

HADLEY & LEREN, (CHARLES W. HADLEY, of counsel,) for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause is here on leave granted to review the judgment of the Appellate Court for the Second District reversing a judgment returned in the circuit court of DuPage county, in the sum of $4000 against appellee the Johnson Oil Refining Company, without remanding the cause; likewise a judgment of $75 in favor of appellant Edna Darner. Appellant Maurice Darner, as administrator, brought suit against one Nate Colby and the Johnson Oil Refining Company, a corporation, for wrongful death of Dessie E. Darner, as the result of the collision of an automobile in which she was riding, with a truck owned and driven by Colby. Colby filed a counter-claim against Edna Darner, the driver

of the automobile in which the deceased was riding, and against appellant administrator, whereupon Edna Darner filed her counter-claim against Colby and the appellee.

Darner, as administrator, charged in his complaint, as did Edna Darner in her counter-claim, that Colby was operating the motor truck involved in the collision, as the agent and servant of appellee the Johnson Oil Refining Company. This was denied and the appellee company averred that it was not the owner of the truck; that Colby was not its agent or servant and that it had no control over him or the truck.

There is little dispute as to what occurred. Whether there was negligence has been settled by the jury and the Appellate Court. The single question for determination here is whether Colby was, at the time of the accident, an employee or agent of the appellee company, or an independent contractor. It is the general rule that the party injured by the negligence of another, must seek his remedy against the person who caused the injury. To this rule well-recognized exceptions arise where the relation of master and servant or principal and agent is shown. In those cases, the negligence of the servant or agent is imputable to the master or principal. But it is necessary, if the case be brought within the exception to the general rule, to show that such relationship exists between the person at fault and the one charged with the result of the wrong. Such relationship must exist at the time and in respect of the particular transaction out of which the injury arose. (*Mosby* v. *Kimball,* 345 Ill. 420.) Whether it exists depends upon the contract between the parties and their relationship as shown by the evidence. Each case must depend upon its own facts. Generally, no one feature of the relation is determinative but all must be construed together. *Bristol & Gale Co.* v. *Industrial Com.* 292 Ill. 16.

An independent contractor is one who renders service in accordance with the will of the person for whom the

work is done, only as to the result of the work and not as to the means by which it is accomplished. (*Hartley* v. *Red Ball Transit Co.* 344 Ill. 534; *Besse* v. *Industrial Com.* 336 id. 283; *Nelson Bros. & Co.* v. *Industrial Com.* 330 id. 27.) Where one undertakes to produce a given result without being in any way controlled as to the method by which he attains it, he is considered an independent contractor rather than an employee. (*Hartley* v. *Red Ball Transit Co. supra; Rosenbaum Bros.* v. *Devine,* 271 Ill. 354.) Where the one employed to do the work, in the course of which the injury occurs, is free to exercise his own judgment and discretion as to the means and appliances which he may see proper to employ in so doing, entirely exclusive of the control and direction of the party for whom the work is being done, he is deemed, in law, an independent contractor. (*Pioneer Construction Co.* v. *Hansen,* 176 Ill. 100; *Jefferson* v. *Jameson & Morse Co.* 165 id. 138.) The right to control the manner of doing the work is of principal importance in the consideration of the question whether the worker is an employee or an independent contractor. (*Decatur Railway and Light Co.* v. *Industrial Board,* 276 Ill. 472.) The test is in the right to control and not the fact of whether actual interference with the method of doing the work is shown by the evidence. If the person for whom the work is being done retains the right to control the manner in which the work is to be done, the relation of employer and employee exists. *Meredosia Levee and Drainage Dist.* v. *Industrial Com.* 285 Ill. 68.

The contract between the appellee company and Colby was introduced in evidence. It showed Colby to have been employed by the company as local manager at its bulk station located at Pecatonica, Illinois. The contract was written in the first person and signed by Colby. Its opening clause is as follows: "In accepting employment with Johnson Oil Refining Company, hereinafter called Company, as its Local Manager at its bulk station located at

Pecatonica, Illinois, I agree to comply with the rules and regulations of the Company hereinafter set forth, and as promulgated from time to time, and I will operate in accordance with said rules and regulations, both as to the sale and delivery of petroleum products and other merchandise entrusted to me by the Company, and in the performance of such other duties as may be required of me by the Company in the course of my employment." The contract is designated "Conditions of Employment." Under it Colby's duties were those of manager of the bulk station of the appellee company which included the delivery of gasoline and oil products to filling stations and other customers, assisting in the installation of gasoline and oil station equipment, and assisting in the work of maintenance of the bulk plant properties. He was accountable to the company for oil, gas and greases which went through the bulk station. He sold none of the products in his own name but in the name of the company, and deposited all funds in a bank in the company's name. He was to pay all operating and miscellaneous expense incurred by him or his employees except freight and drayage on incoming shipments, which appellee company was to pay, except drayage from the local railroad depot to the bulk plant on merchandise stocks. The company was to pay postage, charges for water, gas, electricity, light and power, telephone and the expense of installation of gasoline and oil dispensing equipment within Colby's territory. In the latter case, Colby was to assist in the work. As compensation he was to be paid a certain commission, according to a schedule which was made a part of the contract and its conditions, and which, as the contract states, "is made a part of the conditions of my employment." The appellee company agreed to pay hauling commission of ½ a cent per gallon on gasoline, kerosene, tractor fuels, oils and greases from one bulk station to another bulk station by Colby's

truck or trucks, where such hauls were authorized by the company.

Colby was to furnish the chasses of the trucks used for transporting the company's commodities to and from the bulk plant and the company was to furnish and install the tank thereon. Colby had one such tank truck. The tank bore the name "Johnson Oil Refining Company," painted in large letters. Colby was to furnish a list of all automotive equipment used and usable in the transaction of the company's business upon his becoming the owner thereof, "giving the necessary information so as to enable the company to properly provide for the necessary Public Liability and Property Damage forms of insurance coverage. The cost to the Company of such insurance coverage is to be invoiced to me."

Colby was required to devote his entire time and attention to his employment and to operate at least one truck every day except Sunday, or to hire a substitute. All employees hired by him were subject to being discharged on the direction of the company, and were required, while in Colby's employ, to observe the rules and regulations of the company, as Colby was required to do. The company established the price at which the commodities were to be sold. Colby was not permitted to extend credit except upon authorization of the company, and then the ticket was to be made out and signed by the customer and forwarded by Colby to the Chicago office of the company.

It was shown by the evidence of James Horton, a divisional manager for the company, that Colby was under his supervision and that whenever a violation of the regulations of the company as to the manner of conducting the business occurred, it was his business to call the matter to Colby's attention. So much for the relationship of the parties as shown by the contract. Colby was the manager of the bulk plant at Pecatonica.

Sometime in the latter part of the month of October he mailed, from Pecatonica, to the company's refining or compounding plant at Chicago Heights, orders for greases, oil and alcohol, indicating on the order that a truck would call soon. On November 2, Colby, with one William Christian, drove a truck belonging to Colby, to Chicago Heights where the truck was loaded with barrels of oil and cartons of grease and alcohol, and was returning to Pecatonica when the collision, out of which this action grew, occurred on the public highway at the intersection of Routes No. 34 and No. 59 near Aurora.

The appellee company's defense was and is that Colby was an independent contractor and that even though he were to be treated as an employee, he was not authorized by appellee to make the trip to Chicago Heights on November 2, and that, while authorized by the contract to convey the company products between bulk stations, that authorization did not apply to hauling the company's products from the producing or compounding plant to the bulk station. It is also argued that the company had no notice of Colby's trip to Chicago Heights on that day, and therefore, it says, even though Colby were considered an employee rather than an independent contractor, he was outside the scope of his employment. It is not denied that the materials that were gotten at Chicago Heights were being returned to the bulk plant at the time of the accident and were for purpose of use and were used in the business of the company. The record shows that it was the custom of bulk plant managers in that territory to get their supply of oil, grease, and alcohol, from the compounding plant at Chicago Heights. The contract does not specifically cover the matter of Colby's authority to go to the compounding plant to procure for the bulk plant at Pecatonica the oils and greases that he was that day transporting. It does show that he was the manager of the bulk plant and that, as

such, he was required to perform such duties as might be required of him in the course of managership.

Colby's evidence showed without dispute that he had more than once gone to this compounding station at Chicago Heights for the purpose of procuring greases, alcohol and oils to be stored at the bulk plant at Pecatonica for further distribution and that he had previously used this particular truck to haul the company's merchandise, though not from Chicago Heights. It was not a tank truck but what is known as a stake truck or platform truck. He stated: "When I made trips to the source of supplies as on November 2, it was so much a hundred for hauling it, and the Johnson Oil Company were supposed to pay for it." He added, however, that it did not pay him for the trip taken on November 2, the day of the accident. He testified, also, that he had engaged livestock haulers who were passing the Chicago Heights compounding plant, to haul back to the bulk plant at Pecatonica the merchandise that he had ordered from the compounding plant for the bulk plant, and that the company paid those truckers.

C. H. Hylar, superintendent of the lubricating plant at Chicago Heights, testified that the commodities that Colby was hauling at the time of the accident had been ordered some days before by Colby who had indicated he would call for them later, and that they held the goods ready for him when he would call for them. So it is clear, from the evidence, that while the matter of transporting the commodities of the company from the Chicago Heights plant to the bulk plant at Pecatonica was not specifically provided for, the practice was for Colby to so procure such needed materials for the bulk plant under his supervision, and that the company paid the cartage charges for transporting them to that bulk plant. There is ample evidence to sustain appellant's contention that according to custom, whenever the commodities of the refining plant or com-

pounding plant at Chicago Heights were needed at the bulk plant at Pecatonica, it was Colby's job to see that they were ordered and delivered.

Herman A. Jones testified he was assistant manager of the station department of the company; that he had no knowledge of Colby's going for those commodities on the day of the accident and that his department knew nothing of it. Hylar testified that the practice was for bulk plant managers to come to the compounding plant to get their supplies. He stated that he knew Colby; knew that he was a representative of the appellee company at Pecatonica and that Colby did not always come for his orders but that his orders were frequently delivered by truck instead of by railway.

Whether the company knew of Colby's trip to Chicago Heights on the day of the accident, or whether it specifically directed him to go there on that day, is not material in an action such as this, brought by a third party for injury on account of negligence. The rule is: "A master is liable to third persons injured by the negligent acts done by a servant in the course of the employment, although the master did not authorize or know of the servant's act of negligence or even if he disapproved or forbade it." (*Singer Manf. Co.* v. *Rahn,* 132 U. S. 518, 33 L. ed. 440.) In *Standard Oil Co.* v. *Parkinson,* 152 Fed. 681, the rule is stated: "A master is liable for damages caused by the negligence of his agent or servant within the scope and in the course of his employment, although he neither directs nor is aware of his acts." In the early case of *Keedy* v. *Howe,* 72 Ill. 133, this court stated: "Text writers on agency, Story among others, say, in a civil case, where an agent does an act in the course of his employment, although the principal did not authorize or participate in, or know of such misconduct, or even if he forbade the acts or disapproved of them, the rule of *respondeat superior* applies. Story on Agency, sec. 452." The issue in such a case is

whether the act done is in the scope of the employment and we are convinced, from the language of the contract of employment and other evidence in the record, not only that Colby was an employee of the appellee company, and not an independent contractor, but that he was within the scope of his employment in securing the supplies from the Chicago Heights plant for the bulk plant at Pecatonica. The fact, as found by the Appellate Court, that the appellee did not know that its commodities were being transported to the bulk plant by Colby's truck is not controlling.

The Appellate Court erred in reversing the judgments against appellee without remanding. Its judgments are therefore reversed and the cause remanded to the Appellate Court to pass upon such other errors as were assigned, if any, on the appeal from the circuit court to it, and if none were assigned, to affirm the judgments of the circuit court.

*Reversed and remanded, with directions.*