Richard LYONS, Appellant,

v.

Richard BARRAZOTTO, Appellee.

No. 92–CV–966.

District of Columbia Court of Appeals.

Argued May 11, 1994.
Decided Oct. 31, 1995.

---

Steven D. Campen with whom Steven Plaisted, Rockville, MD, was on the brief, for appellant.

David B. Stratton, Washington, DC, for appellee.

Before WAGNER, Chief Judge,* and FERREN and SCHWELB, Associate Judges.

WAGNER, Chief Judge:

Appellant, Richard Lyons, appeals from an order of the trial court granting the motion of appellee, Richard Barrazotto, to set aside a jury verdict of $250,000 in favor of Lyons and granting a new trial in an automobile negligence case. In granting Barrazotto's motion, the trial court concluded that: (1) Lyons failed to establish a *prima facie* case of negligence; (2) Lyons is barred from recovery because of his own contributory negligence; and alternatively, (3) the verdict was against the clear weight of the evidence, thereby warranting a new trial, particularly considering the weakness of the evidence of proximate cause and the improvident admission of certain medical reports. On appeal, Lyons challenges the trial court's ruling. We hold that, viewing the evidence in the light most favorable to Lyons, the evidence was sufficient to establish a *prima facie* case of negligence and to defeat a claim of contributory negligence. Therefore, the trial court erred in granting a judgment notwithstanding the verdict. We further hold that the trial court abused its discretion in granting Barrazotto's motion for a new trial.

## I. *Factual Background*

Lyons filed a complaint for damages alleging that he had sustained injuries as a result of Barrazotto's negligent operation of his minivan which struck Lyons.[1] The claim arises out of events which occurred on April 10, 1989 in an alleyway located in the area between 13th and 14th Streets and F and G Streets in Northwest Washington. At that time, Lyons was employed at a construction site of a building under construction which faced F Street. Behind the building was a large alley which ran parallel to F Street. The large alley could be accessed through a smaller alley which ran between two buildings and opened onto G Street at one end and intersected the large alley in a T formation. There were usually about 125 workers at the construction site each day, and therefore, a significant number of pedestrians moving in the alleyway. There were approximately 120 people on the job site on the day of the accident.

According to Lyons, on the morning of the accident, he was returning to the construction site carrying food and beverages for some of the crew in a large cardboard box, which was about two feet by sixteen or eighteen inches tall. He walked through the smaller alley, which was used by vehicles and pedestrians associated with the construction project or by others making deliveries to the commercial businesses abutting both alleys. Barrazotto and his sons owned the Clement's Pastry Shop, which faced 14th Street on the western side of the alley. Lyons testified that he saw the minivan, which later hit him, drive into the alley and pass him on the left. The van then turned in front of Lyons, which caused Lyons to pause and notice Keith Byron, the job superintendent. Lyons walked over and spoke to Byron after waiting briefly to get his attention. He then looked to the right and saw the van just "sitting" about eight feet away. Before crossing the larger alley in a diagonal line headed toward the door of the job site, Lyons looked both ways and saw nothing coming. Lyons took at least four steps before he heard someone shout "look out." Knowing the prospects for something falling at a construction site, Lyons squatted and turned to the left toward the only direction from which traffic could enter the alley. He explained that he looked left instead of right at this point because the van to his right was parked, and there were no reverse lights or other signal from the vehicle indicating that it was about to back up.

According to Lyons, Barrazotto backed up his vehicle and struck Lyons on the elbow,

---

\* *Judge* WAGNER was an *Associate Judge* at the time of argument. Her status changed to *Chief Judge* on June 14, 1994.

1. Lyons also sued Clement's Pastry Shop, the owner of the minivan, on a theory of vicarious liability. The trial court granted a directed verdict for Clement's at the conclusion of appellant's case because the evidence did not establish that at the time of the accident Barrazotto was using the minivan within the scope of his employment.

lifting him up and causing Lyons to stumble before he caught his balance. The impact of the blow drove Lyons' arm and shoulder up into his neck area. Lyons caught himself, bent down on one knee, and checked to see whether the coffee had spilled in the box. Despite the impact, Lyons did not drop the box. Mr. Byron helped Lyons up and asked if he was okay. Lyons responded that his "funny bone" felt funny. Barrazotto slowly backed the van back further, rolled down the window, and said "I'm sorry, I didn't see you, are you okay." Lyons replied that he was not sure and that he was going to take the food upstairs. When Lyons returned to the alley to talk to Barrazotto and Byron, whom he had seen talking to each other from the 10th floor, both men were gone.

Lyons testified that he worked the rest of the day, although he could not perform his regular job because of pain, numbness, and weakness in his arm. On his way home, he went to see Dr. Edward Fisher at Hadley Hospital. Dr. Fisher, who is Board certified in the field of general and traumatic surgery, qualified as an expert witness in his specialties without objection. Dr. Fisher testified that he examined Lyons that evening and found tenderness in his neck, upper back, right shoulder and right elbow, and numbness in his right hand. It was Dr. Fisher's opinion at that time that Lyons suffered "a contusion or a bruise to the elbow and shoulder area and indirectly, to the neck area or the trapezius muscle." He treated Lyons with ultrasound to the neck, shoulder and elbow area.[2]

Lyons testified that he returned to work the next day because he needed the money and anticipated that his foreman would allow him to perform light duties until he recovered. Instead, he was assigned to do his regular job, but assistants were available to help. He completed the week, but he did not return to work thereafter because he experienced muscle spasms, and Dr. Fisher had advised him not to work at that time. Dr. Fisher treated Lyons about twenty times from the date of the accident until August 8, 1989.[3] According to Dr. Fisher, Lyons had an electromyography (EMG), which Dr. Fisher described as an objective test which measures nerve conduction across a muscle. The test showed that Lyons had ulnar nerve entrapment across the right elbow joint. Dr. Fisher testified that, to a reasonable degree of medical certainty, the impact of the accident, as described by Lyons, caused Lyons' injuries. Because Lyons continued to complain of pain, Dr. Fisher referred him to Dr. Chidambaram, a neurologist. Prior to Lyons' departure from the Washington area, Dr. Fisher suggested that Lyons obtain an opinion about surgical options.

Lyons moved to Tulsa, Oklahoma with his wife, and for a short time, he was enrolled at Oral Roberts University.[4] While at the university, he enrolled in a golf course for which he received a grade of "D." Lyons explained at trial that he passed a written examination for the course for people with disabilities. In Oklahoma, Lyons saw a neurological surgeon, Dr. Ralph Richter, who performed various tests including a magnetic resonance imaging scan (MRI). Because the pain had not subsided, Lyons began treatment with Dr. Richter. Dr. Richter recommended surgery which would have entailed removal of the first right rib to relieve the nerve compression and pain.

Dr. Fisher saw Lyons again on May 14, 1991 and found that his condition had worsened. Between that date and the time of trial, Dr. Fisher saw Lyons seven more

2. Dr. Fisher described ultrasound treatment as follows:
 It's a machine that produces sound waves that massage in a micro massage, a kind of massage way and deeply into the muscle to prevent coagulation.

3. Dr. Fisher signed a report stating that he discharged Lyons on July 3, 1989 with improvement. In explaining the July date, Dr. Fisher testified that he might have thought that Lyons was leaving for Oklahoma in July.

4. Lyons was convicted in the United States District Court in Oklahoma for making false statements. In explaining the reason for his conviction, he testified that he filed for benefits in Oklahoma at a time when he had no income, but he subsequently received benefits under a worker's compensation claim and failed to report the income.

times. Dr. Fisher testified that upon examination he found Lyons' hand to be swollen, a condition which Dr. Fisher attributed to the accident. He also testified that surgical procedures could reduce the level of pain and disability which Lyons suffered, but it would not restore him completely to normal.

Barrazotto called two medical expert witnesses, Dr. Major Gladden, a board certified orthopaedic surgeon, and Dr. Donald Cooney, a board certified neurosurgeon. Dr. Gladden examined Lyons and found no objective evidence of abnormality in his arm, elbow, shoulder, or neck. Dr. Cooney found that Lyons had "no objective neurological findings." Both of Barrazotto's experts were of the opinion that, giving appellant the benefit of the doubt regarding his chronic and persistent pain, they would not rule out some psychological explanation for his complaints.

## II. *Motion for Judgment Notwithstanding the Verdict*

Appellant argues that the trial court erred in granting Barrazotto's motion for judgment notwithstanding the verdict. He contends that although the trial court recognized the appropriate standard for consideration of the motion, it failed to apply it properly. It is Barrazotto's position that the trial court properly granted the motion because no reasonable juror could find by a preponderance of the evidence that he was negligent and that Lyons was not contributorily negligent.

### A. *Standard of Review*

■ A judgment notwithstanding the verdict is appropriate only in extreme cases, where "no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party." *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986) (citing *District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C.1982) (en banc)); *Lewis v. Washington Metro. Area Transit Auth.,* 463 A.2d 666, 669 (D.C.1983). We have emphasized frequently that when there is some evidence from which jurors could find the requisite elements of negligence, or when the case turns on disputed facts and the credibility of witnesses, the case must be submitted to the jury for deter-

mination. *Washington Welfare Ass'n, Inc. v. Poindexter,* 479 A.2d 313, 315 (D.C.1984) (quoting *District of Columbia v. Gandy,* 450 A.2d 896, 900 (D.C.1982), *modified on other grounds,* 458 A.2d 414 (D.C.1983)). If reasonable persons might differ, the issue should be submitted to the jury. *Lewis,* 463 A.2d at 669. Thus, cases " 'in which only one conclusion reasonably could be drawn from the evidence, and in which negligence ... and proximate cause will not be questions of fact for the jury,' are 'unusual' cases." *Oxendine,* 506 A.2d at 1103 (quoting *Rich v. District of Columbia,* 410 A.2d 528, 532 (D.C. 1979)). In reviewing the trial court's grant of a judgment notwithstanding the verdict, we apply the same standard as the trial court. *Id.* Applying that standard, we conclude that this is *not* one of those "unusual" cases.

### B. *Proof of Negligence*

■ Viewed in the light most favorable to Lyons, the evidence showed that on the morning of the accident, Lyons saw Barrazotto's van parked about eight feet away from him before crossing the alley. The driver gave no signal or other indication that he was going to back up before he did so and struck Lyons. There was evidence that the alley had a significant amount of pedestrian traffic daily because of the work at the construction site and that Barrazotto parked there regularly. Thus, it is reasonable to infer that Barrazotto was aware that backing a vehicle in the alley had to be undertaken with caution to avoid endangering pedestrians. According to Lyons, he looked left, right, and then left again before crossing, and Barrazotto gave no warning that he was about to move his vehicle. Barrazotto backed his van and struck Lyons' elbow. After the accident, Barrazotto admitted that he had not seen Lyons before he struck him, even though his vehicle is a small van, somewhat like a station wagon, with windows all around it. At that time, he told Lyons, "I'm sorry, I didn't see you, are you okay." Viewing the evidence in the light most favorable to Lyons, it cannot be said as a matter of law that Barrazotto was not negligent.

Lyons' theory of negligence, which the foregoing facts support, is set forth in the trial court's instruction to the jury. [E]very person who drives on a public roadway, which includes an alley, must use ordinary care at all times to avoid colliding with other people who also may be using that roadway, and to avoid placing himself or other people in danger. And while he may assume that others will use ordinary care and obey the law, he may not for that reason fail himself to exercise ordinary caution.[5] You are instructed that when a person is using or is about to use a street or alley to [sic], either as a pedestrian or as a driver of a car, a van, he has a duty to keep a proper lookout and make reasonable observations as to traffic and as to other conditions which confront him in order to protect himself and to protect others while he's using the roadway.

Now, just what observations he should make and what he should do for his own safety are matters which the law does not attempt to regulate in great detail, except that it does place upon the person the continuing duty to use ordinary care at all times to avoid an accident.

The fact that one who has a duty to look testifies that he did look but did not see that which was plainly there to be seen is of no legal consequence and significance. The requirement imposed on a person by law is to look effectively. One who looks and does not see something that's plainly there to be seen, is as negligent as one who does not look at all.[6]

 Applying the evidence to the law, a juror could have concluded reasonably that Barrazotto was negligent in: (1) failing to use ordinary care to avoid hitting a pedestrian; (2) failing to keep a proper look out to protect others using the roadway; (3) failing to use ordinary care to avoid an accident; (4) failing to look and see Lyons, who was plainly there to be seen; and (5) failing to exercise ordinary care in backing his vehicle.[7] Nevertheless, in granting Barrazotto judgment notwithstanding the verdict, the trial court concluded that the evidence failed to establish that Barrazotto was negligent. It could have done so only by resolving credibility conflicts on the issue of negligence in favor of Barrazotto.[8] Weighing the credibility of witnesses, resolving factual conflicts, and determining the inferences to be drawn from the evidence are matters for determination by the trier of the facts. *Aqui v. Isaac*, 342 A.2d 370, 372 (D.C.1975). "Only in the exceptional case is evidence so clear and unambiguous that ... negligence should be found as a matter of law." *Tilghman v. Johnson*, 513 A.2d 1350, 1351 (D.C.1986) (citations omitted). The evidence of negligence in this case is not "so clear and undisputed that fair-minded men can draw only one conclusion." *Aqui*, 342 A.2d at 372; *accord*, *Elam v. Ethical Prescription Pharmacy, Inc.*, 422 A.2d 1288, 1290 (D.C.1980).

## C. *Contributory Negligence*

 The trial court also granted Barrazotto's motion for judgment notwithstanding the verdict because it determined that Lyons was contributorily negligent as a matter of law. A plaintiff's contributory negligence is a complete bar to recovery in this jurisdiction. *Elam, supra*, 422 A.2d at 1289 n. 2 (citing *Brown v. Clancy*, 43 A.2d 296, 298 (D.C.1945)). A defendant has the burden of proving that a plaintiff's negligence was a proximate cause of plaintiff's injuries. Standardized Civil Jury Instructions for the Dis-

---

5. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 7–2 (Rev. ed. 1985).

6. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 7–3 (Rev. ed. 1985).

7. The trial court also gave standard instructions defining negligence as the failure to use ordinary care, *i.e.,* "that caution, attention or skill a reasonable person would use under similar circumstances." Standardized Civil Jury Instructions for the District of Columbia, No. 5–1 (Rev. ed. 1985).

8. The job superintendent, Mr. Byron, testified on Barrazotto's behalf, that he did not see the van strike Lyons. He stated that he told Lyons, who was leaning against the van, to move out of the way so that Barrazotto could get his vehicle out of the alley. Barrazotto testified that he saw Lyons walking across the alley, stopped his van, and Lyons continued walking into the back side of the van.

trict of Columbia, No. 5–14 (Rev. ed. 1985); *District of Columbia v. Sterling,* 578 A.2d 1163, 1165 (D.C.1990); *Aetna Cas. & Sur. Co. v. Carter,* 549 A.2d 1117, 1119 (D.C.1988). Issues of contributory negligence, like issues of negligence, present factual questions for the trier of fact "[u]nless the evidence is so clear and undisputed that fair-minded men can draw only one conclusion." *Aqui, supra,* 342 A.2d at 372; *Spain v. McNeal,* 337 A.2d 507, 509 (D.C.1975) (generally, questions of contributory negligence are for the jury). " 'Only in the exceptional case is evidence so clear and unambiguous that contributory negligence should be found as a matter of law.' " *Washington v. A. & H. Garcias Trash Hauling,* 584 A.2d 544, 547 (D.C.1990). In reviewing an appeal from a judgment notwithstanding the verdict predicated on the grounds of a plaintiff's contributory negligence, we must also consider the evidence in the light most favorable to the non-moving party. *Spain,* 337 A.2d at 508. Viewed in that light, we conclude that the evidence did not establish contributory negligence as a matter of law.

■■■■■■ A pedestrian also has a duty to exercise reasonable care for the protection of his or her own safety. *See Washington, supra,* 584 A.2d at 546. Although *Washington* involved a collision between a bicyclist and a garbage truck, it is instructive here. In *Washington,* we observed that "[t]he bicyclist, for his own safety, was obliged to pay close attention to the movements of the truck, and to anticipate the possibility that it might turn right, toward the bicycle." *Id.;* *see also* Standardized Jury Instructions for the District of Columbia, No. 7–13 (Rev. ed 1985) (defining pedestrian's duty of care in crossing a street or highway). In *Spain,* a

case involving a collision between two automobiles, we recognized the injured party's duty to observe potential hazards, stating that "[i]f [plaintiff's] attempts to look down [the street] were inadequate, however, and his failure to be properly observant was a proximate cause of the collision, then [plaintiff's] recovery would be barred by contributory negligence." *Id.,* 337 A.2d at 509.

In this case, the trial court properly submitted the question of Lyons' contributory negligence to the jury. In instructing the jury on the law, the court explained the reciprocal duties of a motorist and a pedestrian to use ordinary care.[9] In returning a verdict for Lyons, the jury apparently determined that Lyons was not contributorily negligent. While there was evidence from which the jury could have concluded otherwise, that is not the test in considering a motion for judgment notwithstanding the verdict. Contributory negligence may be established *as a matter of law* only if "the facts are undisputed and but one reasonable inference may be drawn." *Spain, supra,* 337 A.2d at 510. In this case, there is much dispute between the parties as to the facts, and, more than one reasonable inference reasonably may be drawn from the evidence presented. Lyons had a duty to exercise reasonable care in crossing the alley in the area of the construction site and to determine that there was no hazard which prevented him from doing it safely. *See id.,* 337 A.2d at 509. Lyons testified that he looked right, left and then right again before crossing and that Barrazotto's vehicle was parked behind his place of business, some eight feet away from him. Viewed in the light most favorable to Lyons, there was no reason for him to anticipate that Barrazotto would back his vehicle at all

---

9. Among the trial court's instructions were the following:

> You are instructed that when a person is using or is about to use a street or alley to [sic], either as a pedestrian or as a driver of a car, a van, he has a duty to keep a proper lookout and make reasonable observations as to traffic and as to other conditions which confront him in order to protect himself and to protect others while he's using the roadway.
>
> \* \* \* \* \* \*
>
> Now, before attempting to cross a street, in this case an alleyway, it is a pedestrian's duty

to make reasonable observations to learn the traffic conditions confronting him and to try to make a sensible decision whether it is reasonably safe to attempt to cross. What observations the person should make and what he should do for his own safety while crossing the street are matters which the law does not attempt to regulate in great detail, except that it does place upon the person the continuing duty to exercise ordinary care to avoid an accident.

and that he could not complete crossing the area safely. It was only when he heard someone shout "watch out" that Lyons looked toward the only entrance to the area for incoming traffic and was struck by Barrazotto's vehicle backing from another direction. It was for the jury to determine whether Lyons' actions under the circumstances amounted to contributory negligence.

The trial court provided a number of reasons for its conclusion that Lyons was contributorily negligent as a matter of law. Among these were several facts which the court deemed to be undisputed. In its written opinion, the trial court outlined these facts as follows: (1) Lyons' awareness of the vehicular traffic density in the alley which necessitated particular caution; (2) the box Lyons carried "which likely was a distraction for him;" (3) Lyons' familiarity with Barrazotto's van and his knowledge that it was moving; (4) crossing the alley prior to the accident to speak with the job superintendent; and (5) Lyons' failure to look for brake or backup lights and the lack of evidence that Barrazotto was speeding excessively. To the extent material to the issue of contributory negligence, none of these facts were indisputedly established. Lyons points out correctly that there was no evidence of heavy vehicular traffic in the alley generally or at the time of the accident. The testimony concerned the density of the pedestrian traffic there. In any event, it was for the jury to determine whether Lyons exercised reasonable care given traffic conditions as they existed on the day of the accident. There was also no evidence that the box which Lyons was carrying distracted him to the extent that it was a cause of the accident. As to the movement of the vehicle before the accident, viewed in the light most favorable to Lyons, the evidence showed that the van was parked and not in motion and that Lyons looked and saw no brake lights. Finally, there was no showing that Lyons' stop for a conversation before the accident contributed to its occurrence. To the extent that speed or the lack of it may have had a bearing on the accident, it was for consideration by the factfinder.[10]

The trial court relied on certain municipal regulations in granting judgment notwithstanding the verdict for Barrazotto. In its Memorandum Opinion and Order, the trial court states that 18 DCMR 2304.2 [11] and 18 DCMR 2304.3 [12] support the conclusion that Lyons was negligent as a matter of law. This theory of liability was not raised by the parties in the trial court. Under the circumstances presented here, application of the regulations by the court post-trial was improper.

 In earlier cases, we have held that a violation of traffic regulations may constitute negligence *per se*. *Bauman v. Sragow*, 308 A.2d 243, 244 (D.C.1973); *Rogers v. Cox*, 75 A.2d 776, 778 (D.C.1950). Subsequently, we have refined the rule to make clear that imposition of liability is not automatic, but limited to situations where the regulation was designed to prevent the type of accident which occurred. *Robinson v. District of Columbia*, 580 A.2d 1255, 1256 (D.C.1990); *Leiken v. Wilson*, 445 A.2d 993, 1002 (D.C.1982); *Stevens v. Hall*, 391 A.2d 792, 795–96 (D.C.1978). Even where the violation is within the protective scope of the traffic regulation, presumptive liability may be rebutted by proof of facts which tend to explain or excuse the violation. *Leiken*, 445 A.2d at 1002. Whether the regulation has been violated and whether that violation is a proximate cause of the injury are within the province of the jury generally. *Id.*, 445 A.2d at 1002; *Stevens*, 391 A.2d at 796.

 Here, these questions were never submitted to the jury because this theory of liability was not raised in the trial court.

---

**10.** The record does not reflect that speed was advanced as a cause of the accident.

**11.** 18 DCMR 2304.2 states that "[e]ach pedestrian crossing a roadway at any point other than within a marked crosswalk, or within an unmarked crosswalk at an intersection, shall yield the right-of-way to all vehicles upon the roadway."

**12.** 18 DCMR 2304.3 states that "[n]o pedestrian shall cross a roadway at any place other than by a route at right angles to the curb or by the shortest route to the opposite curb, except in a crosswalk."

The trial court considered the regulations *sua sponte* in resolving the motion for judgment notwithstanding the verdict. Barrazotto argues that the trial court can take judicial notice of the traffic regulations at any stage of the proceedings. Traffic regulations are a part of the law of this jurisdiction which the court may consider without their admission into evidence. *Banks v. B.F. Saul Co.*, 212 A.2d 537, 540 (D.C.1965). When requested, the court is required to take judicial notice of municipal regulations. *Id.* However, that does not mean that new theories of liability based on traffic regulations can be introduced by the court in post-trial proceedings and thereby defeat the opposing party's opportunity to rebut the presumption of negligence and to challenge proximate cause.[13] *See Leiken, supra,* 445 A.2d at 1002; *Lewis, supra* 463 A.2d at 674. In any event, the many factual determinations required for resolution of negligence, even applying the traffic regulations, preclude judgment as a matter of law. *See Elam, supra,* 422 A.2d at 1290. Unless reasonable persons could draw only one conclusion from the evidence as to whether any applicable regulations were violated or whether such violation proximately caused the accident, the resolution of these issues is for the jury. *Bauman, supra,* 308 A.2d at 244. Therefore, we are constrained to hold on this record that the trial court erred in relying on the traffic regulations as a basis for granting a judgment notwithstanding the verdict.

### III. *Motion for New Trial*

#### A. *Standard of Review*

 Lyons argues that the trial court abused its discretion in ordering a new trial,

in the alternative, on the ground that the verdict was against the clear weight of the evidence.[14] This court's review of an order granting a new trial is limited to whether the trial court abused its discretion. *Washington, supra,* 584 A.2d at 545 (citing *Oxendine, supra,* 506 A.2d at 1110). The scope of review is a narrow one when the trial court denies a motion for a new trial and sustains the jury's verdict. *Oxendine,* 506 A.2d at 1111. However, greater scrutiny is required where, as here, the court sets aside the jury's verdict by granting a new trial. *Id.* Where the jury has exercised its factfinding function, closer scrutiny is necessary " 'to protect the litigants' right to jury trial.' " *Id.* (quoting *Lind v. Schenley Indus. Inc.,* 278 F.2d 79, 90 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)); *accord, Scott v. Monsanto Co.,* 868 F.2d 786, 789 (5th Cir.1989).

 The trial court has discretion to set aside the jury's verdict if it is against the *clear* weight of the evidence. *See Washington, supra,* 584 A.2d at 545; *see also Bell v. Westinghouse Elec. Corp.,* 483 A.2d 324, 327 & n. 2 (D.C.1984). A new trial may also be granted if "damages are excessive, the trial was unfair, or there was a prejudicial legal error in the proceedings." *Bell,* 483 A.2d at 327. "In contrast to a motion for judgment notwithstanding the verdict, which requires the court to consider the evidence in the light most favorable to the non-moving party, a motion for new trial requires consideration of all the evidence, both favorable and unfavorable." *Felton v. Wagner,* 512 A.2d 291, 295 (D.C.1986) (citing *Rich, supra,* 410 A.2d at 534–35). Where the court grants a new trial because the verdict is against the clear weight of the evidence, we will scrutinize to

---

13. Lyons argues that the alleyway where the accident occurred is not a public roadway, and therefore, the provisions of 18 DCMR 2304.2 and 2304.3 do not apply. He contends that there was no showing that the area was publicly maintained as required by the definition for "highway" which is set forth in 18 DCMR 9901. He also argues that the characteristics of the area, including its rough condition and its use as a construction site, indicate that it does not fall reasonably within the laws applicable to thoroughfares. *See Robinson, supra,* 580 A.2d at 1257–58. We need not decide this issue in light of our disposition of the case. However, we

point out the arguments to show some of the issues that a party might be precluded from developing where such theories of liability are advanced belatedly.

14. Although an order granting a new trial is not appealable ordinarily until after the new trial has been held, an exception is made where, as here, the trial court granted the motion for judgment notwithstanding the verdict and, in the alternative, the motion for a new trial. *Vassiliades v. Garfinckel's, Brooks Brothers,* 492 A.2d 580, 593 n. 8 (D.C.1985).

assure that the trial court did not simply accept one version of the facts over another.[15] *Felton,* 512 A.2d at 295. The trial court may not "set the [jury] verdict aside as against the weight of the evidence merely because, if [it] had acted as trier of the fact, [it] would have reached a different result." 6A MOORE'S FEDERAL PRACTICE ¶ 59–08[5], 59–148 (2d ed. 1995).

As reasons for granting Barrazotto's motion for new trial, the trial court determined that (1) the verdict was against the clear weight of the evidence, and (2) Barrazotto was prejudiced by the improper admission into evidence of certain medical reports of doctors and diagnosticians who were not present to testify at trial. These two grounds are interrelated as the trial court's memorandum opinion reflects.[16] The trial court also stated that the evidence of proximate cause and damages was exceedingly weak. It concluded that admitting the reports deprived Barrazotto of an opportunity for cross-examination and that Barrazotto was plainly prejudiced thereby, as it could not be said that the jury was not influenced substantially by the reports. The court also observed that, aside from these inadmissible

medical reports, the only credible objective evidence of any injury was Dr. Fisher's observation of a contusion. The court stated that Dr. Fisher was a family friend of Lyons, and therefore, likely to be biased in his favor. As for Lyons' own testimony concerning his injuries, the court noted that he had been impeached with a prior conviction for making false statements and that there was evidence that Lyons had played tennis and enrolled in a golf class after he was injured.

## B. *Admission of the Medical Reports and Records*

The trial court admitted into evidence medical reports and test results prepared by certain doctors, who did not testify, and by medical facilities located in Tulsa, Oklahoma.[17] These reports formed, at least in part, the basis for expert opinions offered not only by Lyons' medical expert, Dr. Fisher, but also by appellee's two medical experts, Dr. Cooney and Dr. Gladden. These exhibits were admitted for the limited purpose of showing the basis of the experts' opinions, and the trial court instructed the jury to that effect.[18] Nevertheless, in granting the mo-

---

15. "[W]hen the trial court has ordered a new trial because of the existence of legal error, 'the appellate court should be more inclined to affirm the grant than when the trial court simply weigh[ed] the evidence differently than the jury.'" *Rich, supra,* 410 A.2d at 536 (quoting *Vander Zee v. Karabatsos,* 191 U.S.App.D.C. 200, 206, 589 F.2d 723, 729 (1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979)).

16. In its memorandum opinion and order, the trial court explained:

The plaintiff relied on his testimony as well as Dr. Fisher's, to prove that he is disabled from chronic pain which has a basis in objective medical findings, and that the disability is substantially the result of being struck on the elbow by the defendant's van in April of 1989. Dr. Fisher's testimony, like plaintiff's own testimony, only proved that plaintiff chronically *complained* of pain. Fisher referred in his testimony to a chart entry that was dated two days after the accident where he had recorded that he observed a contusion. Other entries in his report refer to plaintiff complaining of numbness and tenderness, but the examinations were all "within normal limits." He treated plaintiff for soft tissue injuries with heat and ultrasound. After a reasonable period, when plaintiff continued to complain, Fish-

er discharged him and referred him to a Dr. Chidambaram, a neurologist. This doctor was not called to testify. Plaintiff had several medical reports of examinations and tests that were admitted into evidence, over objection, which tended to support his theory that there was an objective basis for his complaints.... No witnesses were called who could be cross-examined about how the tests were performed; how the results had been interpreted; or, the qualifications of the Doctors.

17. One report was produced by a local physician, Dr. E. Jacob, who also did not testify.

18. The trial court instructed the jury:

Several medical reports have been admitted into evidence in this case that were generated by doctors and medical personnel who have not testified in this trial. These reports are considered hearsay evidence and are not admitted as affirmative evidence. That is, they are not in evidence, I didn't let them come in evidence for you to consider them as proof of the truth of what they purport to show. Rather, they were admitted in evidence because the medical experts who did testify used them in reaching their conclusions and those witnesses referred to them in their testimony.

Therefore, in deciding this case, you may not consider the medical reports of physicians who

tion for a new trial, the trial court held that the admission of the evidence was error that prejudiced appellee because "it cannot be said that the conclusions contained in the reports did not substantially influence the jury in reaching its verdict." Lyons argues that the trial court abused its discretion in granting a new trial on the basis of the admission of this evidence. He contends that the evidence was properly admitted because: (1) Barrazotto consented to admission of the evidence; (2) it was admissible for the limited purpose of showing the foundation for the experts' opinions; and (3) the reports contain essentially objective observations or objective test results. Lyons also contends that, even assuming error in this regard, it was harmless as the evidence was merely cumulative of other testimony. We consider each of these arguments in turn.

Lyons argues that Barrazotto agreed to the admission of the medical reports, and therefore, waived any claim to post-trial relief by reason of their admission. Barrazotto claims that waiver should not be a consideration in ruling on whether the trial court acted within its discretion in ordering a new trial based on its finding that the medical reports were improperly admitted and unfairly influenced the jury's verdict. We cannot agree that a party can consent to the admission of evidence of this type at trial and then be granted a new trial because of its admission. Therefore, we find it essential

for our review to determine whether Barrazotto consented to the admission of all of the challenged reports.

 After completion of the testimony, the parties addressed the admissibility of the medical exhibits. All of the medical experts had relied upon some aspects of the reports in formulating their opinions. Barrazotto agreed to the admission of the exhibits with the limiting instruction proposed by the court.[19] Barrazotto then objected only to plaintiff's exhibits 53–56, the notes of Dr. Richter, on the ground that none of Barrazotto's medical experts had used them in testimony. At least with respect to exhibits 49, 58, 59 and 62, Barrazotto, in relying on the exhibits during trial and in consenting to their admission into evidence, has waived any objection to their improper admission as a basis for a new trial.[20] However, it cannot be concluded that Barrazotto agreed to the jury's consideration of exhibits 53 through 56, the notes of Dr. Richter, who treated Lyons in Oklahoma. Therefore, we consider whether these reports were otherwise admissible.

 The medical reports were admitted for the limited purpose of showing the foundation of the experts' opinions and not for the truth of any fact contained in the reports, and the jury was so instructed by the trial court.[21] Hearsay of the kind upon

did not testify as establishing the fact of the alleged injuries, but you may consider them in evaluating the credibility and in weighing the opinion of the experts who did testify in the trial.

19. See note 18, *supra*.

20. Exhibit 49 is a report of an EMG. Exhibits 53–56 are office notes made by Dr. Richter, appellant's treating physician in Tulsa, recording appellant's complaints of pain and numbness. Exhibits 58, 59 and 62 are, respectively, an arteriogram report, an MRI report and a somatosensory test.

21. Appellant also argues that the medical records were admissible as substantive evidence, to prove the truth of the matter asserted, because they consisted of "simple and routine observations" and statements made to a treating physician for the purpose of medical diagnosis or treatment. Admissibility of hospital or medical reports containing observations of a physician or diagnosti-

cian who is not present to testify turns on whether it is a simple routine observation. *Rotan v. Egan*, 537 A.2d 563, 567 (D.C.1988); *see also Thorne v. U–Haul of Metro D.C., Inc.*, 580 A.2d 672 (D.C.1990). "The test for admissibility is whether the records are composed *solely* of '[r]egularly recorded facts as to the patient's condition or treatment on which the *observations of competent physicians would not differ.*'" *Adkins v. Morton*, 494 A.2d 652, 662 (D.C.1985) (quoting *New York Life Ins. Co.*, 79 U.S.App.D.C. 66, 72, 147 F.2d 297, 303 (1945)) (emphasis added) (other citations omitted). Simple and routine observations about which expert witnesses are not likely to disagree may be admissible without a witness being present; otherwise, fundamental fairness requires the opponent have the opportunity for cross-examination. *Rotan*, 537 A.2d at 566; *Thorne*, 580 A.2d at 675. The reports in question include exhibits 49 (EMG report), 58 (arteriogram), 59 (MRI), and 62 (somatosensory test). While the experts generally agreed that these are objective tests, they differed somewhat

which medical experts customarily rely in formulating an opinion "is properly brought to the jury's attention." *In re Samuels,* 507 A.2d 150, 154 (D.C.1986) (notations in medical record admissible to evaluate psychiatrist's opinion). In making a diagnosis, physicians rely on information from a variety of sources, including reports and medical tests from other physicians or hospitals. *See In re Melton,* 597 A.2d 892, 901–03 (D.C.1991) (en banc). Barrazotto does not dispute that the expert in the courtroom may rely on that same type of data as a basis for an opinion even though it may be hearsay. *See id.* at 901–02. We agree that it was not error to admit the reports for that limited purpose. *Id.; U.S. Gypsum v. Baltimore,* 336 Md. 145, 647 A.2d 405, 420 (1994) (underlying material of the type reasonably relied upon by experts may be admitted as evidence for the purpose of explaining the basis of the expert's opinion). However, Barrazotto contends that the trial court has discretion to exclude evidence where its probative value is substantially outweighed by the danger of misleading the jury. *See Reed v. United States,* 584 A.2d 585, 591 (D.C.1990). Thus, he contends that as a matter of discretion, the trial court could conclude properly that admission of the reports led to an unjust result which warrants a new trial. We agree that the trial court can properly exclude evidence which is otherwise admissible if it finds that its probative value is substantially outweighed by its prejudicial effect. *See id.* Therefore, to the extent that the court relied upon such an analysis in granting a new trial, we consider it.

 "Prejudice arising from the improper receipt of evidence may be mitigated when the same information, or very nearly the same information, has been properly placed before the jury through another witness or in a different form." *Rotan, supra* note 20, 537

A.2d at 567. Even if it had been improper to admit this evidence, and we do not so hold, it had already been placed before the jury by the witnesses. Dr. Fisher testified, without objection, about the contents of the medical reports, including Dr. Richter's progress notes reporting appellant's persistent complaints of pain. Barrazotto moved into evidence and adopted plaintiff's exhibit 58, the arteriogram. All three experts testified about exhibit 59, an MRI report of Lyons' cervical spine, which was normal except for a minimal midline disc bulge at the C5–C6 region.[22] Both Dr. Gladden and Dr. Cooney testified about exhibit 62, the results of an upper-limb somatosensory before the exhibit was moved into evidence. The medical reports at issue added nothing new to the testimony of Barrazotto's experts and of Dr. Fisher.

 Barrazotto argues that he was prejudiced because the admission of the exhibits allowed the jury to peruse them during deliberations. The trial court instructed the jury as to the limited use for the exhibits just prior to their deliberations. The jury is presumed to follow the trial court's instructions, including limiting instructions. See, *e.g. Harris v. United States,* 602 A.2d 154, 165 (D.C.1992) (en banc) (citing *Clark v. United States,* 593 A.2d 186, 193 (D.C.1991)). The timing of the instruction provides some assurance that the jury would understand and follow it as they proceeded to deliberate. There is no indication in the record that the jury misused the evidence.

## C. *Weight of the Evidence*

The evidence provided the jury was not clearly weighted in favor of either side; therefore, it cannot be said that the clear weight of the evidence favors one side.[23] *See*

---

in the interpretations and conclusions contained in the reports. Having examined them, we conclude that while they contain some simple observations, they contained observations on which competent experts might differ. Therefore, the complete reports would not be admissible under the *Rotan* test. However, in this case, Barrazotto did not challenge their admissibility as a basis for expert opinion, and his experts relied upon the reports in testimony.

22. Dr. Fisher testified that the disc bulge at the C5–C6 region was significant. Dr. Gladden was of the opinion that it was not significant, and Dr. Cooney stated that the bulge was normal for anyone over the age of 20.

23. Although not the principal basis for the trial court's ruling on the motion for new trial, the court stated generally that it also found weak the evidence of proximate cause and damages. To the extent the ruling was based on the circum-

*Scott, supra,* 868 F.2d at 791. The trial court was of the view that but for the inadmissible medical reports, there was insufficient objective evidence of damages and causation. Careful scrutiny of the record reveals otherwise. Dr. Fisher testified that he observed a contusion on Lyons' elbow and an injury to his neck and trapezius muscle when he examined him after the accident. He noted tenderness in the affected areas which he confirmed by an objective test for muscle spasm to assure that Lyons was not feigning injury. Dr. Fisher further testified that exhibit 58–A, an objective test which was introduced by Barrazotto, showed a diminished ulnar pulse in Lyons' right side. He testified, without objection, that the EMG showed "ulnar nerve entrapment across the elbow joint." When Dr. Fisher resumed treating Lyons in 1991, he observed that Lyons had significant swelling of his hand and a diminished hand grip. Dr. Fisher testified that Lyons' physical condition corroborated the information Lyons provided concerning the occurrence. Dr. Fisher treated Lyons over a significant period.

Although there was evidence that Barrazotto's experts were well-qualified, each of them saw Lyons only once for less than an hour, and more than two years after the accident. The testimony of the experts was in conflict, and there was no clear weight of the evidence on either side. Barrazotto's experts testified that they found no objective basis for Lyons' claim. Dr. Gladden found no elbow deformity, no decrease in strength or atrophy of the right arm, and no abnormality of the muscles at the time he examined him. Furthermore, he found that there

was no residual injury to the right arm, and there were no objective neurological findings to support Lyons' persistent complaints of pain. Dr. Cooney found no difference in muscle tone between Lyons' right and left arms, and he testified that there was no medical reason for surgical removal of Lyons' rib. Both Dr. Cooney and Dr. Gladden suspected that Lyons' complaints were psychosomatic. Although they challenged the severity and duration of Lyons' injuries, they did not testify that the injuries for which Lyons was treated could not have been proximately caused by the accident.

When the evidence is sufficient to support the verdict, the trial court may set it aside and grant a new trial "when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice." [24] *Rich, supra,* 410 A.2d at 534 (quoting *Capital Transit, supra* note 24, 68 A.2d at 210 (quoting with approval from *Yeatts, supra* note 24, 122 F.2d at 354)). In ruling on the motion, the trial court may consider and weigh all of the evidence; however, the *Rich* court rejected the grant of a new trial where it was based *merely* upon the trial court's reservations regarding the testimony adduced by the prevailing party. *Id.* at 535. In reviewing an order granting a new trial, this court scrutinizes more strictly orders predicated upon a reweighing of the evidence "in order to protect the litigants' right to jury trial." *Id.* at 536 (quoting *Lind, supra,* 278 F.2d at 90; *Oxendine, supra,* 506 A.2d at 1111). Such motions should be granted only if "the verdict is against the great—not

stances surrounding the occurrence of the accident, our examination of the record against the standard of review discussed in this section suggests that this is not a case for a new trial. The circumstances surrounding the accident and the impact to Lyons' elbow was simple and contested, making it less likely that the jury misapprehended the issues. *See Scott, supra,* 868 F.2d at 789–90. We have addressed elsewhere in the opinion the medical evidence related to proximate cause.

24. In *Rich,* the court further stated:

[The trial judge] may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear

weight of the evidence or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice.

*Rich, supra,* 410 A.2d at 535 (quoting *Capital Transit Co. v. Crusade,* 68 A.2d 207, 210 (D.C. 1949) (quoting *Aetna Gas & Sur. Co. v. Yeatts,* 122 F.2d 350, 354 (4th Cir.1941))). Here, the trial court did not expressly indicate that its ruling was based on the conclusion that a new trial was necessary to prevent a miscarriage of justice, *see id.,* and we discern no miscarriage of justice.

merely the greater—weight of the evidence." *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 363 (5th Cir.1980) (citing *Spurlin v. General Motors Corp.,* 528 F.2d 612, 620 (5th Cir.1976)); *accord, Williams v. Valdosta,* 689 F.2d 964, 974 (11th Cir.1982). In this case, the trial court ruled that the evidence, including that of Lyons' expert, was insufficient to support the verdict in his favor. In light of the standard by which we are governed, on the facts of this case, we conclude that the trial court abused its discretion in so ruling and impermissibly substituted its judgment for that of the jury. *See Rich,* 410 A.2d at 536; *see also Conway,* 610 F.2d at 363.

In a case in which the testimony was not clearly weighted in favor of either side, the trial court abused its discretion and encroached upon the jury's province by rejecting Lyons' and Dr. Fisher's testimony which supported a finding of liability and damages, based on the trial court's own assessment of credibility. In ruling on a motion for a new trial, the trial court "must consider all of the evidence and is not required to view the evidence in the light most favorable to the non-moving party." *Rich, supra,* 410 A.2d at 536 (citing *Wright & Miller,* FEDERAL PRACTICE AND PROCEDURE § 2806, at 43–44 & n. 60). However, when a jury's verdict is supported by sufficient evidence, and where the non-prevailing party cannot show that the verdict is against the clear weight of the evidence, the trial court's contrary view of the credibility of the witnesses, in itself, does not justify granting a new trial.[25] *See id.; Hutchinson v. Stuckey,* 293 U.S.App.D.C. 224, 227, 952 F.2d 1418, 1421 (1992). Where, as here, the evidence consists of conflicting expert opinions, and an impartial trier of fact could reasonably have credited either side's testimony, it is the function of the jury, and not the court, to determine the credibility to be accorded to each (quoting *Vander Zee, supra* note 15, 191 U.S.App.D.C. at 206, 589 F.2d at 729. *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1559 (11th Cir.1984)). Because, on these facts, the credibility of witnesses was peculiarly for the jury, it was "an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict."[26] MOORE, *supra,* ¶ 59.08[5], at 59–149; *see also Baber v. Buckley,* 322 A.2d 265, 267 (D.C.1974).

**25.** Our opinions in *Fisher v. Best,* 661 A.2d 1095 (D.C.1995) and *Washington v. Garcias Trash Hauling,* 584 A.2d 544 (D.C.1990) do not suggest a contrary result because the orders granting a new trial, which this court affirmed, were not entered merely because the trial court would have reached a different result or merely because the evidence was sharply in dispute. The role of the trial court has been aptly described as follows:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it was quite clear that the jury has reached a seriously erroneous result.

6A MOORE'S *supra* ¶ 59.08[5], 59–150.

**26.** The trial court found that the defense impeached Lyons with a prior conviction for making false statements, offered proof that he had played tennis during the summer after the alleged injury, and enrolled in and passed a golf class while in Oklahoma. Lyons offered an explanation at trial for the circumstances surrounding his one conviction and his limitations in his attempts to play tennis and take the golf class. Although the facts on which the court relied may have been favorable to the defense, a fair consideration of the record as a whole does not warrant the conclusion that it would be unreasonable for the jury to find in Lyons' favor notwithstanding any impeachment. Accordingly, the jury was capable of weighing, and entitled to weigh, Lyons' credibility in light of these revelations and explanations.

In discounting Dr. Fisher's testimony, the trial court stated that Dr. Fisher was "a friend of appellant's family and likely to be biased in favor of plaintiff." Dr. Fisher testified that he knew Lyons' mother, who was a long-time patient, who had catered some functions at his house, and once he had seen appellant at the house. Lyons' treating physician testified that this relationship did not influence his testimony. In any subsequent trial, the same evidence would be presented, no doubt. In weighing Dr. Fisher's testimony, the jury was well able to assess such factors.

For the foregoing reasons, we hold that the trial court erred in granting the motion for judgment notwithstanding the verdict, or alternatively, a new trial. Therefore, the order of the trial court is reversed with instructions to vacate the order and reinstate the jury's verdict.[27]

27. There remains pending in the trial court Barrazotto's motion for remittitur which was not passed upon by the trial court and not considered on appeal.